Good morning, your honors, and may it please the court. Wait a second until these folks sit. Apologies. Okay, I think they're now set. All right, please proceed. Try that again. Good morning, your honors, and may it please the court. My name is Tony Bisconti of Bienert-Katzmann-Littrell-Williams. You need to speak up a little bit. We're not hearing you very well. Absolutely, your honor. My name is Tony Bisconti of Bienert-Katzmann-Littrell-Williams for Clifton Capital Group, LLC. I'd like to reserve three minutes for rebuttal. Keep your eye on the clock, and we'll try that. I'll do, your honor. In this case, the bankruptcy court committed clear error when it awarded the fee applicant, the former Chapter 11 trustee of East Coast Foods, which is the corporate name for the more commonly known restaurant, Roscoe's Chicken and Waffles, world famous. The first question that I have is do you have standing, of course, and that is a function of whether or not you are really injured by the fee award. Yes, your honor. What's the best argument that you have standing under those circumstances? Yes, your honor. Clifton Capital Group, the appellant here, is one of the, if not the largest, unsecured creditors in this case. It's also by virtue of agreements with the former Chapter 11 trustee, the last one to get paid under the plan of reorganization. Here we have a case where there's been no distribution to creditors. The plan was confirmed in July of 2018, so we're now four years out. The last projections of when distributions would begin was second quarter of 2022. We're well past that. Let me just stop for just one second. Do you agree that, at least on paper, in the plan, that you will absolutely get paid? I agree that the plan provides for 100% payment to unsecured creditors. So you're concerned more in a real-world sense. You're saying, I don't care what the plan says. I'm worried that this is not going to happen. Is that right? Well, we have confidence that all creditors will be paid. The issue here is a matter of timing in terms of— Wait, wait. You have confidence that all creditors will be paid? Well, that's what the plan provides. Well, I mean, that comment right there suggests you don't have standing. Why are you here? If you're going to get paid, why do you care what the attorneys get? The issue for standing is whether someone has a pecuniary interest, and that can mean a number of things. One, whether or not— No, you have to show that you are likely to be aggrieved.  And so here we have a situation where there's nearly $400,000— Did the plan cover anything about attorneys' fees? What allocation did it make for attorneys' fees? So the way the plan works, if my recollection serves, is administrative fees, which would include attorneys' fees for estate professionals, as well as the former Chapter 11 trustees' fees get paid on the effective date. And if my recollection serves me correctly, that was September of 2018. But the plan didn't allocate any amount that it was anticipating paying for that? My friend, Mr. Tetrick, and correct me if I'm wrong, I do not believe so. It was what would be submitted, and I believe the final fee applications came after the plan was submitted. So how is it that a plan can guarantee that you'll get paid if the plan doesn't even know what the liabilities are going to be? Where are these funds coming from? Is there an excess fund that can be drawn upon that is above and beyond what the plan has? And the way this plan was structured—and, again, my memory may be failing me, but I believe, in general, the way this plan was structured, it would come from a few sources. Operations of these four restaurants that are the worthy debtor in this case, as well as contributions from the revenues of outside restaurants on an annual basis. And so if, theoretically, under the plan, if there was going to be an extra $500,000 paid out in attorneys' fees, that money would just be covered by that excess operating profit or capital that's generated. But to your point, that might actually delay your payment. So that's your real harm. You're really—and you don't have to concede this, but it does sound like you're less worried about getting paid and more worried about the timing of the payments. Well, we—it's timing of the payments, absolutely. And that is sufficient to provide appellate standing in a bankruptcy case. Wait a minute. Yes, Your Honor. Does the plan specifically state all the dates on which you will be paid? No. Okay. So how do you know there's a timing problem? Because payments—well, let me backtrack. I believe the plan did have benchmarks for when payments would begin, when the waterfalls would begin. You said second quarter of 2022. That was the last projection. So the plan, when originally filed, had projections of when distributions would be made. Has any distributions been— As far as I know, no, as of today. But you don't know one way or another whether they will be paid, right? We don't know. Okay. So what I struggle with here is I'm having trouble seeing where you're aggrieved. If you had a promissory note and it said it's supposed to be paid on X date, and that date has passed, notwithstanding everybody's best interest, gotcha. But what you've got here is a plan that contemplates a payment, which under the plan terms, you're going to be paid in full, absolutely paid in full. And you have not questioned that that's going to happen. You're just saying you're worried that even though there's not a date certain when you're entitled to be paid, that whenever they would have been paid, it probably is going to be later. I have trouble seeing how you are aggrieved by that. Help me with that. Well, I believe, and I can find a site perhaps when I'm doing my rebuttal. You're a young man. You can't be losing your memory yet. Well, there was a lot here. And, frankly, this issue because— Look, admittedly, we're asking some deeper questions here because, I mean, the district court sort of took it as a given that you're aggrieved in the sense that, and maybe this is another question, is all this money coming from the same pot of money? Because what we're struggling with is how do we determine standing here? I mean, I think, you know, there's a problem if we say, hey, the plan says what the plan says. Plans are amended all the time. I mean, how confident are you, you know, in the plan? That's a problem I think we have to grapple with. But separate from that, what's the rule of when you're aggrieved? I mean, if, say, there were three pots of money and attorney's fees were coming out of one pot of money and all the creditors would be paying out of the other two, then you would agree you're probably not aggrieved there because whatever money they're taking out of you wouldn't have had a claim on that. And so the district court kind of laid out some general principles like, yeah, where everybody's fighting over the same pot of money, there is standing. The party might be aggrieved, but it's not clear that you all are fighting over the same pot of money. We are. We are. It's the same pot of money. There are different streams that contribute to that pot of money, but all payments, administrative claims, and then eventually, hopefully, unsecured creditors are being paid from the same pot. I guess an example to maybe frame this, we're talking about 100% plan. So if the standard on whether a party has appellate standing to appeal something like a fee, anything in a case where there's been a confirmed plan that proposes to pay creditors 100%, then no one would have standing, for example, if instead of a fee award here, if the trustee said, you know what, my wife has really supported me, so I'm going to take this $400,000 from the estate, hand it to my wife. No creditor, no party in interest would be able to challenge that because it's a 100% plan, if they'll eventually be paid in full. That's not the law. But, again, I realize this is a little different thing than Lujan, which, of course, is something we deal with all the time. But the Supreme Court has made it clear we don't deal with speculation, suppositions. You've got to be actually injured. And I frankly don't see it yet. Maybe you can clarify this for me, but to me this is a speculation on your part. You don't know whether you're going to be injured. You don't know whether it's going to be late. You think it might be, and that's the basis on which the court lets you move forward as an objector. But how can we treat this anything other than a speculation on your part? Let's be honest. It's not a speculation because we're already late. We're already years past when distributions were to begin under the plan. I think that's the question. I'm not sure that that's true. I don't know. I mean we started looking through the plan, and it's hard. It's difficult to make sense of it. He did that when he was having trouble sleeping. It solved the problem. Well, this didn't put you to sleep. You had these interesting criminal cases, and now you're dealing with bankers. Let me put you to the—this is important. This is what the district court said about standing. This is important because to date there is not sufficient capital to pay all creditors. Well, of course, right? I mean the plan didn't anticipate that to date all were going to be paid. So the question is—and maybe the district court just focused on the wrong question. The question seems to be what is the likelihood that in the future your payments are either going to be delayed. I think that's a fair claim because delay raises a whole lot of uncertainty. I mean maybe we're in a recession, and then all of a sudden nobody wants chicken and waffles in a recession, it turns out. So that would be a problem. But that's not what the district court said. The district court said the funds aren't here right now, that's enough. And I'm not sure that's the right test. Now, you may satisfy the right test, and we could look at that, but what's your best case for why— I mean, first of all, do you think that the district court's analysis is correct, that all we need to do is say, well, there weren't sufficient funds, or as Judge Smith has suggested, there is a plan. The question is how likely is the plan going to be complied with. Well, I do believe the district court was correct on the standing issue. In the result or the analysis? In both. In both. For the reasons that—I don't think in terms of standing you can just say, okay, well, we have a confirmed plan. That's a 100 percent plan. Forget whether creditors have been paid, when they'll be paid. That deprives anyone of taking an appeal. But that's not what we're talking about here. As I understand it, you're not saying that what the plan contemplated is not happening, right? That is what I'm saying or that is not what I'm saying? No, you're not saying that the plan has, if you will, been breached. People have not failed to honor their obligations under the plan. What the district court seems to have said was, well, you know, we realize all these monies were never intended to be there at this point. But even though we don't know for sure, that's the way we're going to do it. But I'm not seeing where you're aggrieved. I really am not. That is not how I interpreted the district court. How can I interpret him saying along the lines of what I began with, which is there's a waterfall here under the plan. My client happens to be the last in line. Well, and he does say in the next sentence, to your point, because the increased compensation to the trustee will further subordinate Clifton Capital's claim. So is that the test we should adopt? I mean, that seems to be more to the point. The fact that there's not enough money at the time, that's a given because it was never anticipated to be there. But the fact that you're further subordinated, that you clearly are going to take on more risk, is that always an aggrieved – I mean, does that always make a party aggrieved if you're going to take on more risk? Yes. Okay. Yes. You're basically saying that any time a professional gets paid before you get paid, you're aggrieved, whatever it is, even if it's $1, right? If it delays – Because you're subordinated to that degree. That can't be. That can't be. Professionals have to make a living. You all know that. And in the bankruptcy court, you need to get the permission of the bankruptcy court to do that. Well, but isn't – okay, go ahead. Well, I think the point is it goes to time. So it's not every time. I wouldn't say that it could be every case that you're aggrieved because you would need to look on what the terms of the plan were, for example. But here, the plan does have a clear timing provision, and $500,000 in this case I think is closer to $400,000. So your claim is the bonus you're complaining about. Yes. Only the bonus. Only the bonus. Okay. Do you want to save any of your time? I know we've taken a little bit over. You know what? Let me just hit the other points. That's fine. I think to get past standing, I think the case is really simple and it boils down to – and this was from the Manoa finance case. You have to show when you're going to have a fee enhancement above the Lodestar, there has to be clear evidence, clearly in the record, and cited by the court, presented by the fee applicant, that the enhancement awarded was necessary either because the rates charged by the fee applicant were unreasonably low. Okay. A question about that. What was the new evidence that was raised by Sharpe in his supplemental briefing before the bankruptcy court? Well, Your Honor, in the first fee application, Mr. Sharpe, the fee applicant, laid out reasons why he believed he was entitled to his fee. It was just hours, billing records, and that was it. When we opposed the first time before the bankruptcy court, and I think this was acknowledged at the hearing before the bankruptcy court, Mr. Sharpe listed on reply about four pages' worth of things that he claimed justified the fee enhancement. We requested at that time the opportunity to respond to that before the bankruptcy court ruled the first time. The bankruptcy court did not allow us to respond. The fee order was entered, went up to the district court for the first time, and then came back down. So when we came back down, it was those four pages' worth of argument that Mr. Sharpe submitted evidentiary cites to. And so we were responding to those items for the first time in our opposition. So your time is up. Any other questions by my colleague? I think not. Thank you very much. Thank you. We'll hear an argument from Mr. Telford, I believe, right? Telford, your honor. Oh, I'm sorry. Oh, no problem. John Telford of Danningville, Israel. Israel and Krasnoff were the trustees. We know your name. Yeah, right. I must be suffering from presbyopia here, and I don't have any glasses on, so. Your honors, I have an issue that I was very disappointed that the district court didn't really consider heavily. The standing. The standing issue. Judge Nelson, you're absolutely correct that the district court. Well, be careful to say I'm correct, because you don't know how I actually think about this. Your observation is correct. But you might be conceding too much. But, I mean, let me ask you this. So why aren't they, why isn't it the case? I mean, the district court cites to Inres Solomon for the position that whenever money is paid out of a fund that you have a claim to, you have standing. Why don't we just adopt that here? I mean, they do have, like, the plan, they clearly have standing to challenge the plan. I think they do have standing to challenge the payments that are made to professionals. The bankruptcy court has to approve those. What's the purpose of having the bankruptcy court approve those if nobody can ever challenge them? Since the early 80s, the standard in the Ninth Circuit has been that a party has to show that it's going to be actually and pecuniarily aggrieved by a particular order. So just a greater risk. Isn't that? Let me talk about this, because you asked this question. It is clear, clear, all creditors, including Clifton Capital, will be paid 100% under this plan. Why is that so, just because the plan says that? The plan provides for payments over time. Now, some of these payments have been delayed for a couple of reasons. Number one is because of COVID, some adjustments were made in order to be realistic about the fact of whether or not the restaurants were able to actually make their obligations to the plan trustee. The issue is the restaurants weren't bringing in as much money, so they couldn't contribute as much to the fund. That's correct. But they still are going to be continuing making payments. It's just the payments were delayed. But say the delay led to, if COVID turns into, I mean, it was already bad. Say it was worse than that. Nobody's going out to eat, and they have to shut down their businesses. So on the back end, and this was a key feature of the plan, it's the reason the trustee supported the plan, is if there's defaults under those payment provisions, the plan trustee, which is not my client, two different trustees here, the plan trustee has the right to exercise, to foreclose on properties which were pledged as collateral. And it's tens of millions. I think it was $20 million worth of value of property at the time. And that's key because it absolutely ensures that creditors will be paid in full. In fact, Clifton Capital's… Unless there happens to be a real estate, you know, cataclysm or something like that. You know, I mean, at this point, we're not talking about… But the reason I say that is because… Okay, so let's take your proposition that they're going to get paid. By all… I mean, this 400,000, extra 400,000 that the trustee got, that's going to have to be made up somewhere. So I don't know how much money was coming in. Maybe it was, you know, $50,000 a month. Well, now they know, oh, it's going to be four months later that we get paid. I mean, that's basically the math. And that goes to Mr. Bisconti's comment about the timing, right? So let's… Now, we've kind of moved beyond projections, but the projections that were attached to the plan showed that even if the trustee were to give back this 400, whatever, about $400,000 that Clifton Capital wants the trustee to give back, that would have no impact whatsoever on the timing of payments to Clifton Capital. In fact, that was one of the express findings by Judge Blubond. It's in paragraph number 100 of her findings, and it's on page 85 of the record. Now, whether or not those projections… Clearly, those projections are no longer exactly accurate because things have happened. Well, but isn't that the problem? That the plan… I mean, no one would expect that the plan is going to be fully complied with four years later. The plan is a best case, or it's a case, but the idea that that's going to follow to fruition four years later, no one knows. And so the question, and this is why you're struggling, the question is, has Clifton Capital, because it's their burden to show that they have standing, has Clifton Capital showed you that on a plan that says they're going to be paid 100% that the reversal of Judge Blubond's order, or at least the part relating to the bonus or the enhancement, is that going to have any impact whatsoever on the timing of payments to Clifton Capital? It seems intuitive that it would. Because if there's more money in the plan, then the payments are going to go out sooner. Yet on the projections that were originally filed, it showed that that intuition was not necessarily correct. Because under the original plan with the projections, which is what we all thought was going to happen, you know, but for COVID, but for this thing. Because right now, your point is under the plan, payments were already supposed to be sent out. They haven't been because the plan hasn't. But not because the trustee was paid. Not because of the trustee. It's because of what we were talking about. Because economic conditions weren't the same. Also because there's still an IRS issue that's still pending that the plan proponents thought was going to be handled really quickly. Yeah, but if an extra $400,000 hadn't been paid to the trustee, that could have compensated for some of the downturn. I mean, that's what I don't understand. There was going to be less money in the pot. Even if the trustee were to give back $400,000 today, no distributions would start. And that's because the trustee still has issues with an IRS claim, which is still pending. That's the reason distributions actually haven't started. Now, none of that is in the record. I understand that it's not my job, though, to show you that they have standing. Can I get a little farther into the weeds, if you will? Let's assume, arguendo, that your opponent has standing. As I look at the record, I'm struggling to find evidence from SHARP that identifies in the record where a chief restructuring officer's compensation was cited as a comparator, if you will. In other words, I don't find – how do you get to the $400,000? What in the record shows that the trustee was entitled to that, in quotes, bonus? I don't think that specific evidence was in the record, Your Honor. Okay. So if there is standing, then I've got a problem with the $400,000 because you've got to at least show why you're entitled to a bonus. You're entitled to the basic fee, and I don't think they're challenging the basic fee. It's just the bonus. But you have a burden to show why the bonus is warranted. I know the bankruptcy judge was very impressed with the trustee's work. You've still got to have some comparator, and I don't see any. Isn't that fatal to the bonus? It's not, Your Honor. The bankruptcy judge is a veteran bankruptcy judge who has presided over hundreds of cases and is very familiar with what is an exceptional case, what are situations in which trustees have provided exceptional services and caused exceptional results. So you can cite us to where the experience of the bankruptcy judge, his or herself, is sufficient to substantiate the payment of a very sizable bonus as opposed to evidence that shows that somebody, a chief restructuring officer and so on, a comparator, if you will, to justify that. Any case? Your Honor, off the top of my head, no, I can't. However, I'm happy to submit additional briefing if you would like. Are you vaguely aware of one, but just can't remember the name of it? Yeah, I believe, Your Honor, that if we were to go through the cases, both bankruptcy cases and probably some non-bankruptcy cases where courts have granted enhancements,  and what the trial judges have observed in that case compared to, well, I'll call it the typical case. And here, that is largely what the bankruptcy judge relied on. Now, one thing I want to note is you may have noticed that Mr. Bisconti, the very first thing he told you is that Judge Blubon committed clear error. The standard here is not clear error. The standard here is discretion. It's absolutely clear that in evaluating the bankruptcy court's order, the question is whether or not the judge abused her discretion. And in doing that, the question is whether or not she applied the wrong legal standard. Here, I believe she applied the correct legal standard the first time, but even the second time after the district court ordered her to apply the lodestar method, she did so. Then the next question is whether or not her ruling is supported by the facts. And here, based on the 56 pages of findings and conclusions of law, the answer is yes. This really was an exceptional result in a case that was a complete and utter disaster when it was turned over to the trustee. And in a short period of time, he turned that around and got the state in a position where proposal of a plan where creditors are guaranteed to be paid 100% became possible. And this really was an incredible result. Fair enough. I mean, the bankruptcy court made a finding that there was exceptional performance. I think that, okay, we can accept that. But it's a 65% enhancement. It's a pretty good enhancement. And do you have any cases where such a large enhancement has been awarded above the lodestar? Yes, Your Honor. There are cases with 1.75, 2.0. I don't know them off the top of my head. I apologize. Could you give us a 28-J letter on both these issues we talked about? Sure. That would be good. And just so that I remember, number one is reliance on judge's experience. Right. And the second is? Without the backup evidence other than the judge's experience. Okay. And then the second is multiplier. And then back to the standing. So the district court cites the Solomon case and the PRTC case for this idea that a creditor does have a direct pecuniary interest in a bankruptcy court's order transferring assets of the estate. Clearly, this was transferring assets of the estate. That seems to apply on its face. How do we write an opinion that says, okay, we understand what Solomon and PRTC says? What's the distinguishing factor in this case? The distinguishing factor is that the transfer has no pecuniary impact upon the creditor. In most cases, creditors aren't getting paid 100%. Right? So that's how we distinguish. We say there was a guarantee in this case, and where there's a guarantee, Solomon and PRTC don't apply. And then you have to look at whether that transfer would have – it could. A guarantee is only as good as the guarantee is. So presumably, if the bankruptcy court – they could still overcome that guarantee, but they'd have to come in and say, no, this is going to materially affect that. Under that case where they have a guarantee, you can't just say, well, now you're going to be put further subordinate. You have to say you're not going to get paid in some way. Correct. And there's two people we can look at in terms of, you know, having testified – or actually three – having testified that creditors are going to be paid 100% in this case. Number one is Judge Blubond. Her findings, paragraph 97. But that's interesting because she said it that way, and that seems so inconsistent with what she said on the standing analysis. No, Judge Blubond – I'm sorry. Judge Blubond is the bankruptcy judge. I apologize. It's the district court judge who – Said the standing. Okay. You know, I'm in – I remember the first time we had oral argument in the district court. It was Judge Fitzgerald. And Judge Fitzgerald made a comment that, well, if they aren't going to be harmed, why are they here, right? And I think that that – Move the question around a little bit. Right. I think that kind of influenced kind of his perspective on the standing issue and why – Well, in fairness, it sounds like 90-plus percent of the cases a creditor – maybe 99% of the cases, I don't know – a creditor in these circumstances would have standing to challenge. You're telling us we should create an exception for those narrow set of cases where there's a 100% guarantee that they're going to get paid. Correct. And I think you're right. Probably about 98%, 99% of cases a creditor would have standing because creditors usually aren't getting paid in full, whether it's a 7 or an 11 or something else. And you don't think that the delay is – why isn't that an agreement? It sounds like – Well, number one, I don't know that there is going to be a delay. Because you don't think there's a delay. The evidence, at least under the initial projection, was that there would be no delay. And Judge Blubin made that specific finding originally. And there's certainly no showing in the record or anything that's been brought to the court's attention in connection with this appeal to show that there is, in fact, going to be a delay. Or flip side, the Clifton Capital is going to receive a penny any earlier if the trustee is required to give back the $400,000. You're almost out of time. Anything else you want to say? I'll just close, Your Honor. Number one, thank you for your time. I know this is an interesting issue. Judge, it's great to see you coming from the Eastern District. There was a case on this issue out of the Sixth Circuit just a couple of weeks ago, came out of the Eastern District of Michigan called Village Apothecary. Village of? Apothecary. Apothecary. Village Apothecary. On this issue, on the standing issue? Sorry, not on the standing issue. On the exceptional results issue. The Sixth Circuit in that case confirmed that in the Sixth Circuit, as well as here in the Ninth Circuit, consistent with the Ninth Circuit law, that exceptional results or the results obtained are, in fact, relevant to an enhancement above the load star. Very well. Thank you. Thanks to both counsel for your fine arguments. We appreciate it. Thank you, Your Honor. The case just argued is submitted.
judges: SMITH, NELSON, UNKNOWN